UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JONATHAN HELLER, Ph.D., )<br><br>Plaintiff, )<br><br>v. )<br><br>CHIRINJEEV KATHURIA, ELIZABETH NG, )<br>OCEAN BIOMEDICAL, INC. )<br>and POSEIDON BIO, LLC, )<br><br>Defendants. ) | C.A. No. _____<br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

### **SUMMARY OF THE ACTION**

1.     Plaintiff Jonathan Heller, Ph.D., brings this action against Defendants Chirinjeev Kathuria, Elizabeth Ng, Ocean Biomedical, Inc. ("Ocean" or the "Company") and Poseidon Bio, LLC (collectively, "Defendants") to recover, among other things, unpaid wages earned during his employment with Defendant Ocean.  Dr. Heller also seeks damages for Ocean's unlawful retaliation against him following his complaints about his unpaid wages and his working conditions.  Dr. Heller further seeks damages based on Ocean's breach of its contractual obligations to him.

2.     More specifically, Defendants failed to pay Dr. Heller any wages whatsoever during and upon termination of his employment with Ocean in violation of the Massachusetts Wage Act, M.G.L. c. 149, § 148 et seq. (the "Wage Act"). Ocean further violated the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (the "FLSA") and the Massachusetts Minimum Wage Act by failing to pay Dr. Heller minimum wage during the course of his employment with the Company.  Moreover, after Dr. Heller complained about his unpaid wages, Ocean retaliated

1

against him, excluding him from investor meeting and stripping him of duties associated with his role as Chief Scientific Officer and Head of R&D.  Following Dr. Heller's resignation from the Company for "Good Reason," Ocean failed to pay Dr. Heller the contractual severance benefits owed to him, including twelve (12) months of salary continuation, the payment of a variety of bonuses, and full acceleration of vesting of all of his equity awards in Defendant Poseidon.

3.      Ocean, with the direct assistance of Defendants Kathuria and Ng, engaged in a long-running scheme to string Dr. Heller along with (false) promises that he would be fully compensated upon the Company's initial public offering ("IPO").  Even following the occurrence of the IPO, however, Defendants have ignored Dr. Heller's request for the outstanding payments and have refused to make good on their promises.

4.      Accordingly, Dr. Heller brings this complaint against Defendants, seeking damages and other appropriate relief in connection with the following claims: (1) failure to pay wages in violation of the Wage Act, M.G.L. c. 149, § 148; (2) retaliation in violation of both the Massachusetts Wage Act, M.G.L. c. 149, § 148A and Fair Labor Standards Act, 29 U.S.C. § 215; (3) failure to pay the minimum wage  in violation of both the Fair Labor Standards Act 29 U.S.C. § 206 and the Massachusetts Minimum Wage Act M.G.L. c. 151, § 1; (4) breach of contract; (5) breach of  implied covenant of good faith and fair dealing; and (6) quantum meruit.

## PARTIES

5.      Plaintiff Jonathan Heller (hereinafter "Dr. Heller") is an individual who resides at 445 Pleasant Street in Belmont, Massachusetts.  In his role as Chief Scientific Officer and Head of R&D at Ocean, Dr. Heller was an "employee" of the Company within the meaning of the FLSA and Wage Act.

6.     Defendant Chirinjeev Kathuria (hereinafter, "Defendant Kathuria") is an individual who, on information and belief, resides in Illinois and he is and was at all relevant times the Founder and Executive Chairman of the Board of Ocean.

7.     Defendant Elizabeth Ng (hereinafter, "Defendant Ng") is an individual who, on information and belief, resides in California and she is and was at all relevant times the Chief Executive Officer of Ocean.

8.     Defendant Ocean is a Delaware corporation with a principal place of business at 55 Clarevick St., Suite 325, Providence, Rhode Island.  Ocean was Dr. Heller's "employer," within the meaning of FLSA and Wage Act.

9.     Defendant Poseidon Bio, LLC ("Poseidon") is a Delaware limited liability company, with a principle place of business at 55 Clarevick St., Suite 325, Providence, Rhode Island.

## JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and because the amount in controversy exceeds $75,000.  Jurisdiction is also proper is this Court pursuant to 28 U.S.C. § 1331, as Plaintiff has brought a claim pursuant to the FLSA.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (i) Ocean's principal place of business in this judicial district, and (ii) Dr. Heller and Ocean agreed to this venue as the exclusive forum for disputes in connection with Dr. Heller's employment.

## FACTS

12.     Ocean is a biotechnology company focused on developing innovative therapeutics through research and clinical trials for the treatment of diseases with high unmet need, including

preclinical development of potential therapies and vaccines for malaria and potential oncology therapeutic antibodies.

13.     During the time of Dr. Heller's employment, Ocean had an early preclinical pipeline consisting of neurofibromatosis assets licensed from Teton Therapeutics, Inc., a company Dr. Heller founded.

### The Original Employment Agreement

14.     On or about November 27, 2018, Dr. Heller discussed an employment opportunity with Defendant Ng, a former colleague, about the formation of Ocean and the technology that the Company sought to license from Brown University.  Defendant Ng explained that the Company needed a Chief Scientific Officer and a Head of R&D, and asked Dr. Heller to join Ocean in those roles.

15.     On February 1, 2019, Dr. Heller began working full-time and exclusively for Ocean as its Chief Scientific Officer ("CSO").  Because it was a start-up company and had yet to secure a license to the relevant technology, Dr. Heller was not provided with any formal employment agreement that documented the terms and conditions of his employment.  Nor was he provided with any compensation for his work.  Rather, he was told by Ocean that he would receive an employment agreement at a later time, which would document the Company's agreement and obligation to pay him.

16.     As CSO, Dr. Heller was the top resource for scientific knowledge at the Company. In short, he was responsible for knowing and communicating, both internally and externally, the science underlying the Company's pipeline, whether it be what the therapeutics are and how they work to potential risks and benefits based on studies of potential side effects.

4

17.    Several months after starting with Ocean, in addition to the CSO role, Dr. Heller also assumed the title of Head of R&D at Ocean, as he had been performing the operational tasks of a Head of R&D.

18.    As Head of R&D, Dr. Heller was responsible for planning and developing the Company's products from the drawing board, or acquisition, to reality through preclinical and clinical research, with the goal of obtaining approval by desired governmental regulatory bodies. In this role, Dr. Heller kept apprised of all aspects of the clinical development process, and remained responsible for communicating the Company's development objectives, strategy, and execution both internally and externally.

19.    In his roles, as CSO and Head of R&D, Dr. Heller reported to the Chief Executive Officer of Ocean, Defendant Ng.

20.    At all relevant times, Ocean had no office or laboratory space or a corporate headquarters. Rather, on information and belief, the mailing address used by the Company was the personal residence of Defendant Kathuria. As a result, beginning in February 2019 and throughout his employment, Dr. Heller performed his job duties primarily from his home in Belmont, Massachusetts. To Dr. Heller's knowledge, during the term of his employment, all employees of the Company primarily worked remotely.

21.    Although Dr. Heller was informed by Ocean through Defendants Kathuria and Ng that securing necessary licenses to the Brown University technology was "imminent" or only "2 weeks away," the licenses did not materialize for many month. When the Company ultimately secured licensing of the underlying technology, Ocean issued Dr. Heller a formal employment agreement on July 1, 2019, reflecting his initial role as the Company's CSO (hereinafter, the

"Original Employment Agreement" attached hereto and incorporated herein as <u>Exhibit 1</u>).  The Original Employment Agreement reflected Dr. Heller's start date of February 1, 2019.

22.     The Original Employment Agreement provided that Ocean would pay Dr. Heller an annual salary of $350,000.  In violation of the Wage Act, however, the Original Employment Agreement reflected Ocean's plan to defer payment of Dr. Heller's earned salary.  The Original Employment Agreement stated that Dr. Heller's salary would "be earned but […] accrue until the closing of the Company's first capital raise (the "Salary Accrual Date")."

23.     Under the terms of the Original Employment Agreement, Dr. Heller was also entitled to a sign-on bonus of $30,000, earned as of his start date of February 1, 2019.  Like his $350,000 annual salary and in violation of the Wage Act, the Original Employment Agreement provided that Ocean would not pay Dr. Heller this earned bonus until the "Salary Accrual Date," *i.e.*, the closing of the Company's first capital raise.

24.     Dr. Heller was told by both Defendants Kathuria and Ng that his earned salary and bonus payments would be forthcoming, upon the first successful capital raise, but that Ocean first needed to retain talent to develop and grow the Company in order to attract investors.

25.     By the terms of the Original Employment Agreement, Dr. Heller was entitled to four (4) weeks of paid vacation per year.

26.     By the terms of the Original Employment Agreement, Dr. Heller was eligible to participate in the Company's Annual Incentive Plan to earn a bonus of up to 100% of his $350,000 salary, with a target bonus of 65% of the salary.

27.     The Original Employment Agreement also made clear that "upon completion of an initial public offering of the equity securities of the Company or any of its affiliates, you will

receive a cash bonus equal to 100% of your Base Salary to be paid immediately upon completion of the offering."

28.     The Original Employment Agreement also outlined extensive equity grants.  Dr. Heller was to receive: (i) an initial grant stock equal to .50% of the Company's total fully-diluted equity as of the date of signing; (ii) an additional grant following the Company's first capital raise, which, together with the Initial Grant, would equal .50% of the Company's total fully-diluted equity as of that date; and (iii) a final grant of stock to be granted immediately prior to the effective date of an initial public offering of the equity securities of the Company or any of its affiliates, together with the initial and additional grants equal to .50% of the Company's total fully-diluted equity as of the consummation of the initial public offering.

29.     On July 1, 2019, Dr. Heller accepted the terms of the Original Employment Agreement and continue to work for Ocean.

### Dr. Heller Continues to Work Without Compensation

30.     Throughout the months that followed, Dr. Heller continued to receive no compensation for any of the work he performed for Ocean.

31.     Upon information and belief, Dr. Heller, as CSO, was one of the few employees who was working full-time for Ocean and not getting paid to work.  Dr. Heller understood that other Ocean employees worked on a part-time basis and supported themselves financially by maintaining paid employment elsewhere.

32.     Dr. Heller, as CSO and Head of R&D, was focused on the scientific and technical aspect of the Company and its developments.  Defendant Ng, as Chief Executive Officer, was focused primarily on the Company's operations.  Defendant Kathuria, as Founder and Executive Chairman of the Board, was focused on external relations and fundraising.  Of the three, Dr. Heller

was the only individual with technical knowledge of the licensed technology and with prior experience as a CSO in drug development.

33.     In his capacity as CSO, as time progressed, Dr. Heller became increasingly apprehensive about Ocean's public-facing representations to investors and other potential partners. In or around July 2020, Dr. Heller began to voice concerns to Defendant Kathuria regarding Ocean's representations to investors and potential partners. Dr. Heller's concern became more acute as Ocean began to exclude him from critical meetings, given his key knowledge of the process of Ocean's drug development and all it entails.

34.     For example, in 2020, Defendant Kathuria asked Dr. Heller to represent to investors that the Company had a program for developing therapies for COVID-19, given that it was a paramount concern and burgeoning area of research and development at the time and a key focus for investors.

35.     Dr. Heller disagreed with this representation, as Ocean did not have such program at the time. Rather, Ocean had only had preliminary meetings with potential partners to discuss this potential work. Over Dr. Heller's concerns, the Company nonetheless included information about a COVID-19 program in its materials.

36.     Apparently concerned with Dr. Heller's tendency to raise his views amongst internal and external stakeholders, Defendant Kathuria began to silo Dr. Heller. For example, Defendant Kathuria cancelled weekly Company meetings in August 2020 onward, preventing discussions between Dr. Heller and research partners at Brown University. This, in effect, was Defendant Kathuria taking away opportunities for Dr. Heller to correct any representations that he made to others.

37.     By early 2021, tension between Dr. Heller and Defendant Kathuria continued to grow. At this time, Dr. Heller and Ocean began discussions regarding an amendment to Dr. Heller's employment agreement.

**Dr. Heller and Ocean Enter into an Amended Employment Agreement**

38.     By 2021, Dr. Heller had invested significant time and some of his own resources into building Ocean.  He was still waiting for payment of his earned salary and bonus.  He continued to trust Defendant Ng given his longstanding professional relationship with her prior to joining Ocean.  Dr. Heller was aware at this time that Ocean had retained new legal counsel and they were preparing new versions of employment agreements and corporate documents for Ocean and its employees.

39.     On February 22, 2021, Dr. Heller and Ocean executed a second employment agreement (hereinafter "Amended Employment Agreement," attached hereto as Exhibit 2).

40.     Under the terms of the Amended Emploment Agreement, Dr. Heller's "employment began on January 1, 2020" (defined as the "Start Date").

41.     Under the terms of the Amended Employment Agreement, Dr. Heller's annual salary continued to be $350,000, "payable in accordance with the Company's standard payroll schedule."

42.     The Amended Employment Agreement continued to (illegally) provide for deferred compensation similar to the terms of the Original Employment Agreement.  Specifically, the Amended Employment Agreement, provided that "[p]ayment of any salary deferred since the Start Date will be upon the successful completion of the IPO […] subject to your continued employment with the Company through such payment date."  Defendant Kathuria told Dr. Heller that this was

necessary because the Company has accrued too much debt in unpaid wages, making third-party investment in the Company (and the Company's ability to pay Dr. Heller) less likely.

43.     Because he was told by Defendant Kathuria that Ocean was struggling to find investors due, in part, to their substantial accrued debts to Dr. Heller and other employees, Dr. Heller understood that the Company sought to understate monies owed to him.  However, he continued to believe in the trajectory of the Company that Defendant Kathuria continued to paint, both within the Company and to outside investors.  He was told that only the IPO -- which was dependent upon attracting more investors -- would generate sufficient revenue to pay employees (including Dr. Heller) what they were owed.  And by this point, Dr. Heller had invested significant time and personal resources in Ocean's success.  For example, in addition to having received no salary, Dr. Heller covered the cost of patent-related fees and expenses for which he never received reimbursement from Ocean.  He also traveled on behalf of the Company to various locations without Company reimbursement.

44.     Under the terms of the Amended Employment Agreement, in addition to his salary, Dr. Heller would also be eligible for a series of bonuses.  Specifically, Dr. Heller would earn a "cash bonus equal to $380,000 (three hundred eighty thousand Dollars), which will be paid in a lump sum within thirty (30) days following the completion of the Company's first capital raise equal to at least fifty (50) million Dollars (the 'First Capital Raise' and such bonus the 'First Capital Raise Bonus')" and a "cash bonus equal to $350,000 (three hundred fifty thousand Dollars) (the 'IPO Bonus') to be paid in a lump sum immediately upon completion of the IPO, subject to your continued employment with the Company through such payment date."

45.     The Amended Employment Agreement also contained the following severance provision:

**5.    Severance.**  Notwithstanding anything to the contrary, in the event your employment with the Company is terminated without Cause (as defined in the Company's 2021 Stock Option and Grant Plan (as amended from time to time, the "Plan") or you resign from the Company with Good Reason (as defined in the Plan), you will be entitled to receive the following severance benefits, subject to your execution and delivery of an irrevocable release of claims in favor of the Company and its affiliates within sixty (60) days of such termination:  (a) continuation of your then-current base salary for twelve (12) months, payable in accordance with the Company's regular payroll cycle; (b) a pro-rata portion of your then-current Target Bonus, based on the number of days you were employed by the Company in the year of termination, payable in substantially equal installments in accordance with the Company's regular payroll cycle over twelve (12) months; (c) full and immediate accelerated vesting of any and all of your then-outstanding and unvested equity awards in the Company; (d) subject to the completion of the First Capital Raise, the First Capital Raise Bonus, payable in a lump sum within thirty (30) days of the completion of such First Capital Raise, regardless of your continued employment with the Company through the payment date; (e) subject to the completion of the IPO, the IPO Bonus, payable in a lump sum immediately upon completion of such IPO, regardless of your continued employment with the Company through the payment date; and (f) extended post-termination exercise periods for your then-outstanding options, to the extent vested and exercisable as of the date of such termination, for the remainder of their terms.

46.    Contemporaneous with the signing of the Amended Employment Agreement, Dr. Heller was required to sign a confirmation of expenses in connection with an audit of Ocean's financial statements for fiscal years 2019 and 2020.

47.    This confirmation of expenses originally did not reflect Ocean's outstanding salary and bonus obligations to Dr. Heller.  After Dr. Heller objected to this omission, the statement was revised to acknowledge that the Company owed Dr. Heller outstanding salary and bonuses.  The statement (attached as Exhibit 3 hereto, emphasis in original) read, in relevant part, that:

(a) The amount owed to you, excluding salaries and/or bonuses, as detailed below:

| Date | Amount |
|------|--------|
| 12/31/2019 | $0 |
| 12/31/2020 | $0 |

48.    Dr. Heller was also required to sign a Grant of Profit Interest Agreement (hereinafter, the "Profit Interest Grant," attached hereto and incorporated herein as Exhibit 4), under which the Company (by its newly formed parent Company, Poseidon, LLC) granted him

76,500 Profit Interest Units.  Dr. Heller was told by Defendant Kathuria and Defendant Ng that there had been an error in setting up the original equity awards granted under the Original Employment Agreement, which impacted all prior employee equity grants (except Defendant Kathuria's) and that the Company had to form a new entity in order to give employees the promised equity.  Dr. Heller grew concerned, particularly because this change impacted the equity holdings of other employees, but not Defendant Kathuria's.

49.    The Profit Interest Grant made clear that 60% of the granted units would vest immediately upon the date of the grant, and the remaining 40% of the granted units would vest in equal quarterly installments following the effective date of the agreement (*i.e.*, February 22, 2021), until the 18-month anniversary of the effective date.  Consistent with the Amended Employment Agreement, the Profit Interest Grant stated that, in the event "Grantee resigns from Ocean Biomedical, Inc. for Good Reason, then any then-outstanding and unvested Granted Units shall immediately vest in full on the date of such termination."

50.    The Profit Interest Grant provides, in relevant part, the following definition of "Good Reason:"

> (d)    "Good Reason" shall mean … (iii) the assignment to Grantee of any duties or responsibilities that results in the material diminution in the Grantee's responsibilities, authority and function as in effect immediately prior thereto, and which are inconsistent in a material and adverse respect with Grantee's position with [Ocean]; …. or (v) a material breach by [Ocean] of any material agreement between grantee and [Ocean], concerning the terms and conditions of Grantee's employment, Grantee's benefits or Grantee's compensation with [Ocean], so long as Grantee provides at least 90 days' notice to [Ocean] following the initial occurrence of any such event and [Ocean] fails to cure such event within 30 days thereafter.

51.    Contemporaneous with execution of the Amended Employment Agreement and Profits Interest Grant, Dr. Heller formally licensed to Ocean certain assets of a company he

12

controlled (Teton Therapeutics), under the terms of the Amended and Restated Exclusive License Agreement, executed on February 25, 2021 ("License Agreement"). Ocean never compensated Dr. Heller in any manner pursuant to the License Agreement.

**Dr. Heller Resigns from Ocean for Good Reason and Remains Uncompensated for All Work Done Through Two and A Half Years of Employment**

52.    Dr. Heller continued to work for Ocean without compensation, based on the assurances that he continued to receive from Defendants Ng and Kathuria that he would eventually be paid.

53.    In May 2021, led by Defendant Kathuria, Ocean began to exclude Dr. Heller from investor meetings.  Despite his conversations with Defendant Ng, who agreed (and supposedly advocated) that having Dr. Heller present at investor pitches and meetings was not only part of his role, but essential to the pitch, on information and belief, Defendant Kathuria obstructed Dr. Heller's ability to perform this important function of his job and attract investments needed to fund his earned but unpaid salary and bonus.

54.    On or about May 11, 2021, Dr. Heller learned that he was to be excluded from an upcoming "road show" meetings with investors.  As CSO and Head of R&D, Dr. Heller believed that it was part and parcel of his role to represent the science and development pipeline of the Company and that Ocean was stripping him of important duties of his job.

55.    Dr. Heller discussed his exclusion from these meetings with Defendant Ng and later documented his concerns in a written notification to both Defendants Kathuria and Ng regarding the Company's material diminution of his job responsibilities.  In an email correspondence entitled "Confirmation that you are excluding me from upcoming 'road show' meetings'." Dr. Heller noted:  "It is the responsibility of the Chief Scientific Office and Head of R&D to represent the science and pipeline of a biotechnology company respectively, and my discussions with both of

you in the past indicated your support me to do so.  I am surprised and discouraged to hear that you are blocking my participation in these discussions as doing so appears to be against the best interest of the company."  See Exhibit 5.

56.     Defendant Ocean failed to cure the material diminution in Dr. Heller's job responsibilities.  It did not allow him to participate in the "road show."  Following the "road show" meetings, Dr. Heller again reached to Defendants Ng and Kathuria on June 9, 2021 to express his disappointment in their decision to continue to exclude him from crucial ongoing investor meetings.  He maintained that participating in such meetings was an integral part of his job as CSO and Head of R&D, asking that they "let [him] do the job [he] was hired to do."  Exhibit 6.

57.     Nonetheless, Ocean failed to cure its material diminution of his job responsibilities and continued to exclude Dr. Heller from investor meetings.

58.     On June 10, 2021, Defendant Ocean filed for a Registration Statement (Form S-1) with the Securities and Exchange Commission.

59.     On August 27, 2021, having heard no response from Defendants Kathuria or Ng in response to his repeated objections to Ocean's material diminution of his responsibilities, authority and functions at the Company and given Ocean's failure to cure, Dr. Heller resigned from Ocean for "Good Reason."

60.     Dr. Heller received no response from Ocean.  Ocean failed to respond to or cure the grounds for his resignation for Good Reason.  Ocean failed to provide Dr. Heller with the severance benefits set forth in the Amended Employment Agreement.

61.     On information and belief, on February 15, 2023, Ocean Biomedical announced completion of its IPO.  Dr. Heller learned of Ocean's IPO through public sources.  He was not contacted by Ocean or Defendants Kathuria or Ng regarding the IPO announcement.

62.     On March 20, 2023, Dr. Heller wrote to Defendants Ng and Kathuria regarding the IPO.   In his communication he states that he "ask[s] you honor my employment contract.   As I left Ocean Biomedical for cause, I am entitled to a portion of the IPO proceeds.   This includes equity and accrued salary compensation among other benefits.   I would like to know Ocean's plan for meeting[] its obligations."   See Exhibit 7.

63.     Having received no response, Dr. Heller contacted Defendants Kathuria and Ng again on March 25, 2023, requesting a response.   See id.

64.     Six days later, on March 31, 2023, Defendant Ng responded stating that: "We have received your message.   The company is focused on several vital filings with the SEC, including our annual audited financial statements.   We will respond more fully late next week after those filings have been completed."   See id.

65.     Having heard nothing further, Dr. Heller emailed Defendants Ng and Kathuria again on April 10, 2023, again requesting a response to his demand for monies owed to him.   See Exhibit 7. Again, he received no response.   As of the date of filing of this Complaint, Dr. Heller has not received any follow up correspondence as to Ocean's plans to honor its contractual obligations.

66.     As of the date of filing of this Complaint, Dr. Heller has not received payment from Ocean of his salary, the $30,000 sign-on bonus that he earned as of February 1, 2019, or his accrued 7.5 weeks of unused vacation time.

67.     As of the date of filing of this Complaint, Dr. Heller has not received the severance benefits to which he is entitled based on his resignation for Good Reason, including twelve months of salary continuation, the First Capital Raise Bonus, and the IPO Bonus, or acknowledgement of his fully vested equity grants.

68.     As of the filing of this Complaint, Dr. Heller has not been reimbursed for any of his out-of-pocket business expenses incurred in connection with his employment with Ocean.

69.     Pursuant to M.G.L. c. 149 § 150, Dr. Heller filed a wage claim with the Office of the Massachusetts Attorney General on May 5, 2023, and on May 8, 2023, received a letter granting him permission to file this action. See Exhibit 8.

## CLAIMS

### COUNT I – M.G.L. C. 149 § 149 – FAILURE TO PAY WAGES
(against Defendants Ocean, Kathuria and Ng)

70.     Dr. Heller realleges and incorporates by reference paragraphs 1 to 69 as though fully set forth herein.

71.     As set forth above, Defendants have failed to promptly and fully pay Dr. Heller his earned and owed wages, and similarly have failed to pay him for his accrued but unused vacation (totaling 7.5 weeks) at termination and his earned but unpaid sign-on bonus, in violation of M.G.L. c. 149 § 148.

72.     As set forth above, Defendants attempted to avoid their obligation to promptly to pay Dr. Heller's wages by entering into a special contract to defer wages, both in the Original Employment Agreement and Amended Employment Agreement, in direct violation of M.G.L. c. 149 § 148.

73.     During Dr. Heller's employment with Ocean, he earned over $875,000 in accrued salary, for which he was never paid.

74.     Ocean failed to pay Dr. Heller for his sign-on bonus of $30,000, which was earned as of his start date of February 1, 2019, upon termination of his employment in violation of M.G.L. c. 149 § 148.

75.     Dr. Heller was not paid for his accrued but unused vacation time (totaling 7.5 weeks) in violation of M.G.L. c. 149 § 148.

76.     As Founder and Executive Chairman of the Board of Ocean, and given his direct role in management of the company, including by executing the Original and Amended Employment Agreements with Dr. Heller, Defendant Kathuria is individually liable to Dr. Heller for violations of M.G.L. 149 § 148.

77.     Given her responsibilities for the management of the Company and payment of wages to its employees, as Chief Executive Officer of Ocean, Defendant Ng is individually liable to Dr. Heller for violations of M.G.L. 149 § 148.

78.     As a result of the harm suffered by Dr. Heller, defendants are liable for treble damages, and attorneys' fees and costs, under M.G.L. c. 149 § 150.

## COUNT II – M.G.L. C. 149 § 148A– RETALIATION
(against Ocean)

79.     Dr. Heller realleges and incorporates by reference paragraphs 1 to 78 as though fully set forth herein.

80.     Dr. Heller repeatedly raised concerns regarding Defendant Ocean's non-payment of wages to the Company.

81.     As a result of Dr. Heller's protected activity, Defendant Ocean, through the actions of Defendant Kathuria, stripped Dr. Heller of important job duties as the Company's CSO and Head of R&D, including its decision to exclude Dr. Heller from investor presentations.  His participation in investor meetings and presentations was integral to his role and in the best interest of the Company.  Upon his voicing concerns as to the nonpayment of his salary, Defendant Ocean retaliated against him in violation of  M.G.L. C. 149 § 148A.

82.     As a result of the harm suffered by Dr. Heller, defendants are liable for treble damages, attorneys' fees and costs, under M.G.L. c. 149 § 150.

### COUNT III -- M.G.L. c. 151 § 1 -- FAILURE TO PAY MINIMUM WAGE
(against Defendant Ocean, Ng, and Kathuria)

83.     Dr. Heller realleges and incorporates by reference paragraphs 1 to 82 as though fully set forth herein.

84.     Dr. Heller worked for Defendant Ocean for a period of two and a half years.

85.     Dr. Heller received no compensation from Defendant Ocean for the work he did throughout the two and a half years of his employment.

86.     Accordingly, Defendant Ocean failed to pay Dr. Heller the minimum wage in violation of M.G.L. c. 151 § 1.

87.     As a result. Defendant Ocean has caused harm for which it is liable for damages, attorneys' fees and costs under M.G.L. c. 151 § 20.

### COUNT IV -- 29 U.S.C. §§ 206, 215 -- VIOLATIONS UNDER THE FLSA
(against Defendants Ocean, Ng, and Kathuria)

88.     Dr. Heller realleges and incorporates by reference paragraphs 1 to 87 as though fully set forth herein.

89.     Dr. Heller worked for Defendants for a period of two and a half years.

90.     Dr. Heller received no compensation from Defendants for the work he did throughout two and a half years.

91.     Dr. Heller repeatedly raised concerns as to the nonpayment of wages throughout two and a half years. Upon his voicing concerns as to the nonpayment of his salary, Defendant Ocean retaliated against him in violation of 29 U.S.C. § 215.

92.     Defendants' actions were taken with willful disregard for the rights of Dr. Heller under the FLSA.

93.     As a result of Defendants' willful and unlawful conduct, Dr. Heller suffered a loss of wages.

94.     As a result of their FLSA violations, Defendants are liable to Dr. Heller for: (a) all unpaid wages for all hours worked; (b) an additional, equal amount as liquidated damages for their willful violations of the FLSA; and (c) reasonable attorneys' fees and costs, pursuant to 29 U.S.C. § 216.

## COUNT V – BREACH OF CONTRACT – Delaware Common Law
### (against all Defendants Ocean and Poseidon)

95.     Dr. Heller realleges and incorporates by reference paragraphs 1 to 94 as though fully set forth herein.

96.     Defendants entered into a binding and valid agreement with Dr. Heller.

97.     Defendant Ocean breached its contractual obligations under the Amended Employment Agreement, whereby it failed to pay any of the agreed-upon severance benefits, including twelve months of salary continuation, the "First Capital Raise Bonus" and the "IPO bonus."

98.     Defendant Poseidon breached its contractual obligations under the Profits Interest Grant, by failing to accelerate his then-outstanding and unvested equity grants in full as of August 27, 2021, the date of his resignation for "Good Reason."

99.     As a result of these breaches of various contracts, Dr. Heller has been damaged and will continued to be damaged as a result of Defendants' breaches of the Amended Employment

Agreement and the Grant of Profits Interest Under the Amended and Restated Operating Agreement.

## COUNT VI – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING -- Delaware Common Law
### (against all Defendant Ocean and Poseidon)

100.    Dr. Heller realleges and incorporates by reference paragraphs 1 to 99 as though fully set forth herein.

101.    Implied in every contract under Delaware law is a covenant of good faith and fair dealing.

102.    Defendants Ocean and Poseidon violated the covenant of good faith and fair dealing by, among other conduct, intentionally disregarding the contractually agreed-upon payments owed to Heller, with respect to services performed during his employment and severance benefits owed to him following his employment, and further when misrepresenting the likelihood of successful completion of the IPO, upon which Dr. Heller's salary and IPO bonus would have been due under the terms of the Amended Employment Agreement.

103.    As a result of these breaches of the covenant of good faith and fair dealing, Dr. Heller has suffered, and will continue to suffer, harm and other damages.

## COUNT VII –QUANTUM MERUIT  –  Delaware Common Law
### (Against Defendants Ocean and Poseidon)

104.    Dr. Heller realleges and incorporates by reference paragraphs 1 to 103 as though fully set forth herein.

105.    Defendants consistently represented to Dr. Heller that funding was near and a First Capital Raise and/or the IPO was imminent.

106.     Defendant Ocean excluded Dr. Heller from investor presentations and discussions, and as a result, was in a position where he had to rely on the Company's representations regarding the status of potential investments.

107.     Dr. Heller reasonably relied on Defendant Ocean's promises and devoted substantial time, energy, and effort to have Ocean achieve its operational objectives.

108.     Defendants failed and refused to honor its promises in refusing to pay benefits to which Dr. Heller is owed under the terms of the Amended Employment Agreement and the Profits Interest Grant, including but not limited to the severance benefits, the First Capital Raise Bonus the IPO Bonus and full acceleration of equity vesting.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Heller respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

a.     Award Dr. Heller wages and any other payment owed to him pursuant to the Massachusetts Wage Act, Massachusetts Minimum Wage Act, and Fair Labor Standards Act or under common law;

b.     Award Dr. Heller treble damages and attorneys' fees pursuant to the Massachusetts Wage Act;

c.     Award interest and costs to Dr. Heller against all Defendants on all Counts;

d.     Order Defendants to immediately deliver the severance benefits owed to Dr. Heller under the terms of the Amended Employment Agreement;

e.     Award multiple, punitive and/or exemplary damages in favor of Dr. Heller against Defendants on all Counts; and

f.     Award any other relief the Court deems just and appropriate.

## JURY CLAIM

Plaintiff Dr. Heller demands a trial by jury on all claims so triable.


Respectfully submitted,


**JONATHAN HELLER, Ph.D.,**

By his attorneys,


/s/ Brendan J. Lowd
Brendan J. Lowd (#9085)
Geri L. Haight
(*pro hac vice motion to be filed*)
Danielle L. Dillon
(*pro hac vice motion to be filed*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel:  (617) 542-6000
Fax:  (617) 542-2241